and Ashfaq Rahman, and InScon Acquisitions. And so Peter Maverick is here for Rahman. Harry Wenderman is here, appearing by Zoom. Oh, you're here. Okay, great. All right, great. And then Anthony Leffert is here for the athletes. So, Mr. Maverick, you may begin your argument. Thank you, Your Honor. I want to primarily focus on damages, the damages analysis, and first on the tortious interference claim. There could have been no damage in this case for tortious interference for three reasons. First of all, the admission of the other party is the real party interest is local blocks. Let me ask you about that, because I am interested in that. And correct me if I'm wrong. My understanding is that of the tortious interference is the service agreement was always between true influence and local blocks. That's correct. One Meta, is that how you say it? Onemata. One Meta. One Meta, I think. One Meta was not a party to that service agreement. Correct. One Meta was solely the majority shareholder at the point that they had that they purchased the majority of the shares of local blocks, I guess. Correct. It was a shareholder. Okay. But that's the only allegation really for the tortious interference. There is no, they didn't claim that there was a merger. They didn't claim anything that there was some kind of contractual obligation between them and true influence. That's exactly correct. I just wanted to understand that. Okay. So that I can be prepared for questions for the other side. And in fact, we had moved for summary judgment on a counterclaim. And one of the issues in the court denied summary judgment is that there's no merger. There's not an alter ego. These are distinct companies. There is no Florida case that I found where a majority shareholder can claim a tortious interference based on a contractual relationship between two parties that, whether or not a named entity in the contract or the service agreement. That's correct. And I, I don't know about the state of law. I agree with that proposition of law. I didn't, but my understanding is exactly what you just said. What about the contract itself? Page four, 2.5.1 of the contract states that local box will be integrated into on him out after closing. And it says the parties acknowledged that after the closing buyer will work to integrate the company local box into and with the business of the buyer and its affiliates. I understand, but it was never done. And, and there was the admission at trial. Um, this is a record D three 81 pages 58 line 20 through 59 line two. The question that I asked at trial was this customer true influence at the time you had already fired Mr. Rahman from local box we had. All right. And this customer was local blocks as customer. Correct answer. That is correct. It was not on a modest customer answer. Correct. And then later he was asked at docket entry three 81 at page 15 lines three to 13 question was, so it's your testimony. I think earlier in the proceedings that local blocks is a distinct and separate company from on Amada. That's correct. He answers. And the question that I asked next was, and that testimony was accurate then. And he answered it's accurate today. So, so there's, it's unequivocal. There's no integration of the companies. There's been no merger. Was there any, um, because in, uh, in, in another case, I can't remember the name now involving a pharmacy and, uh, uh, another company that was trying to take over the space. Is there any testimony that one Mata was involved in discussions with true influence in order to, uh, create a service agreement between the two entities? No, there is testimony, um, in the record candidly, where, where there was a discussion saying on Amada, who is operating the company, they were the operating entity. So that's in the record candidly, but, but it's not ever a testimony that ever indicates on Amada is the, is the party negotiating for its own interest. And it was an independent, everybody understood that, that, that, that, that the companies were acting in concert and that would be damaged to the other. Isn't that, that's what the jury, listening to the evidence, the jury came to that conclusion. You, we want to second guess the decision of the jury? The jury instruction, I think is important to look at here. And that, in that instruction, it is a document entry 369, page 17. And whether Rahman intentionally interfered with the contract between local blocks and true influence. And if so, such, whether such interference was a legal cause of damage to Onamada. Onamada is as like any other shareholder, is not the real party in interest. Any interference would be a claim that's owned by local blocks. Look, as a shareholder, that's not an integrated company. The shareholder is owning the company. You may have people in Onamada working in the operations of local blocks, but that's not one company. That's a distinct position they've taken throughout the case and a trial. We're applying Florida law and I'm looking at Ethan Allen versus Georgetown Manor. And that case pretty much says, you know, as long as there's an understanding between the parties that would have been completed had the defendant not interfered, uh, establishes a business relationship that the companies were acting together. I mean, how do we get around Florida law? Because that, the difference here is that would be an apples to apples comparison of its local blocks interference with Rahman interfering with local blocks contract with true influence. And that was in the Ethan Allen case. The, the Florida Supreme Court found that Georgetown had no identifiable agreement with its past customers. I mean, you do have to have some sort of relationship or identifiable interest. Um, so the existence of a business relationship or some kind of identifiable interest. Correct. IE like negotiations or something where you're having a torsion interference with that. Correct. And I agree with that, what you're saying, Your Honor. And I, and that's because I think there really wasn't not that here. You don't have that business relationship here. I can see. Yes. I think that Judge Legault is correct. Of course, that there's not a Florida case saying that, um, that tortious interference can apply in this case. I'm also not sure that I've seen one where it says that it can't. Um, I think our case from 2001 international sales and service, um, recognizes that this area of law is not entirely clear in Florida. Is there, is there any reason that we shouldn't ask the Florida Supreme Court to answer this question? I think law is clear with the factual context of this case where you have a contract and it's amendment. We're both with between true influence and local blocks. We have the entire business dealings of that. As far as the Supreme Court weighing in, I think the law is clear enough on this issue, but that would be, that's not my decision. I only have a minute. I'd like to raise one other issue if I may. I want to make sure I answer your question. On the fundamental damages in the case though, there's a bigger problem, which is the damages do not warrant $5 million for two reasons. So first of all, you have a, it's based on the server misuse issue and there's only one piece of evidence where there is a mentioned by Will Smith that he's the president of Onamada that there is one month, $120,000. The expert doesn't get into the damages, doesn't get into the calculation, the analysis doesn't explain it. So it's a speculative damage claim to have one data point of one month where there's $120,000. The additional problem is that you also have the value, this is a contract case. So you've got a contract where your purchase price of seven and a half million, and then he's saying there's a $5 million damages. But then the jury, part of that purchase price is $3 million for promissory notes. Those notes were, the jury denied that. So you would have more damage than the value of the company at the purchase price. When you say those notes, the jury denied that, explain what you mean. So you have the, the value of the company was 7.5 based on the purchase price. The jury said you have $5 million in damage for this. But that purchase price subsumes the existence of $3 million in notes. And there was $7.5 million minus the notes, you're assuming that the consideration was paid. The jury denied getting payment on those notes. So you have a damage award that exceeds, it's impossible to have the damage award. You'd have a negative value of the company. The notes were not paid, you're saying. Were not paid. Okay. But the damages include the repayment for the payment of the notes that never happened. Is that what you're saying? Precisely. Because it's supposed to be purchase price minus what you got. If I, I caused this damage and that was, that reduced the value of what I'm getting. That would be 2.2 million. But in addition to that, they denied our claims for $3 million in promissory notes. That would be a negative value of like $700,000. Was that part of your counterclaim? It was, and it was part of the appeal. And so they can't build that into the damage analysis. It's a speculative and incorrect. There's no way a reasonable jury. How was this argued to the jury though? I mean, was this argued to the jury? This issue was raised to the jury that we have a direct claim for the damages. The issue here is no, we're no reasonable trier of fact. No reasonable jury could come to a conclusion of having a negative value of the company. Relied principally on Mr. Sigunor's, if I'm pronouncing his name correctly. And he was their expert testimony and why couldn't the jury rely on his calculations? So if they rely on his calculation, it's speculative to take. And I just want to be candid with the court. I'm over my time. So you can answer the question. Thank you, Your Honor. The, the issue is that there's two reasons. The data point for the server misuse because they've conceded in their brief. It's not, there's three issues here. One is the sales tax and that there's really no damage for that. The other one is you're dealing with the X-Mode issue and there too, they say in their brief, that doesn't, they don't rely on that. So you're talking about server misuse. He says the service we use was the damage. And there's only one piece of testimony where he says, and one month it was 120,000. That's a high point. And it varied month to month. So it becomes speculative as the basis of his opinion. The expert never, his testimony never got an analysis whatsoever to the jury. It was astounding on the issue of what are the damages. And it was, how does he come up with a $5 million calculation and that calculation? So it's, it's a speculative analysis, speculative calculation based on a single data point. A jury can't base it at a reasonable jury can't do that. But in addition to that, that assumes that you've paid the $3 million in promissory notes because it's $7.5 million purchase price without the notes. There were a lot of data points used in his valuation, right? And he reviewed the financial statements, the stock purchase agreement, the tax returns, the pleadings, the projections, and all that factored into his expert testimony. But an expert testimony assumed the notes were paid, the $3 million in notes were paid to get to that number. So you're assuming that the purchase price really is 7.5, not 4.5, where the notes aren't paid. And yes, your honor, there were other data points, but this testimony, when he was questioned about this, you're relying on three factors and the ones I identified. That's how his testimony was. You're correct. He did evaluate other things and that is accurate. But his reliance and his explanation would not support this. Remember, there's other testimony that there are some other issues that wouldn't support this, such as there was an Amazon server expense of $300,000. That was a piece of damage. There was an Acton money of $80,000 and there was a separate MBAR consulting over $18,000. Those numbers are relatively small. They add up to a total of $650,000. He didn't address them, but in the light most favorable to the other side, you might say, well, they considered that, but they don't come close to 5 million. And they certainly don't account for this difference in the $3 million. The jury was told that the notes hadn't been paid, right? Was there any dispute over whether they had been paid? Not that I've seen. Okay. Not only were they not paid, we presented evidence also that they were put on notice, the notes were being accelerated, that this is a part of the claim, and that was all litigated. So that was all presented. Okay. Thank you. Thank you. All right. I think we have no argument. Mr. Maverick, and we'll hear from Mr. Wenderman on behalf of Appellant Arifin. May it please the Court, my name is Harry Wenderman. I'm here on behalf of Sabira Arifin. The contract needs to be the quintessential step in any agreement between two parties. That agreement sets forth a bright line as to their relationships going forward. The contract in this case was drafted by Onamada, and it provided that there would be a 90-day period. In case they hadn't completed their due diligence, there was a 90-day period in the contract where any further adjustments would be made. Onamada did not make those adjustments. They were aware of them all. They should have been aware of them all. And based on that, that alone, the bright line that exists here is that all the rest of the case goes away. I've got a question a little bit precedent to that, which is, you occasionally cite to Mr. Rahman's original Rule 50 motion as a basis for preserving some of your arguments on appeal. Did you adopt that Rule 50 motion as your own? And if so, where in the record is that reflected? I did adopt it as my own, and I believe that the record does reflect that. I can't point to any particular page. But it makes no sense for me not to adopt it. Ms. Arifan and Mr. Rahman are married. They were presented as a unit. As a matter of fact, there was absolutely no testimony at trial that Ms. Arifan made, except for the contract, made any representations or engaged in any of the nefarious activities that Onamada brought forth at trial. Maybe while your friends on the other side are arguing, you could find where in the record that would be reflected. Thank you, Your Honor. Thank you. As Learned Counsel pointed out, the math here doesn't work, pointed out in the brief. The purchase price assumes that the notes were paid and further, that the stock that was given as part of the consideration also had value. No value was given to the stock in the damages calculation, and that stock became worthless when Mr. Rahman was kicked out of the company. He was the true value. As we point out, the expert that they called did not take into effect the personal value of Mr. Rahman. He goes to True Influence. True Influence sells for Mr. Rahman. The math doesn't work. Isn't it harder for them to believe in someone who they say was not honest about the liabilities of the company? Thank you. I'm glad you brought that up. It segues me very nicely into the next step. There is a meeting in July. The closing takes place in December. Everything goes great. Great analysis. We've cited it all. Suddenly in July, all of these things come out. Does Mr. Rahman get kicked out then? Does Ms. Arifin get kicked out then? No. The company goes forward. They ratified all the other supposed bad acts, and the jury should have ignored them all based on the principle of ratification. The contract became ratified. All the objections become immaterial. We established, I believe, that the contract was adopted by the parties. Again, I emphasize with this court, because I draft contracts like this, it's very important to have a bright line in the sand so that the parties know that that 90th day, if they haven't presented a problem or they haven't made an adjustment, that's the purchase price. Thank you. All right. Thank you, counsel. Mr. Leffert. Thank you. May it please the court, Tony Leffert on behalf of Onomata Corporation. Because of the way the court addressed the initial questions, I'd like to start with true influence. First of all, there's a lot of misstatement about what was actually in the record and what was presented to this jury. This jury heard a nine-day trial over three weeks. They had numerous witnesses and expert witnesses that testified. On the specific issue, Judge Wilson, I think, put it exactly right. They're asking you to second guess this jury, but not just the jury. They're asking you to second guess the judge who denied three separate motions under Rule 50. It is important to note that there was a sufficient business relationship between Onomata and true influence. Not just the fact that the contract references that Judge Wilson has already pointed out, and yes, they were a wholly owned subsidiary. More importantly, Onomata paid all the expenses, took all the revenues, but here's the key point. It was the Onomata employees who were working with true influence. I won't name them all, but there's at least six. One person in particular, Craig Smith, an Onomata employee, was the person actually negotiating with true influence. In their briefing, they say he didn't testify at trial. Well, he did testify at trial through videotape. It was his videotape deposition. Judge Lagoda's question, I think, goes to exactly what was testified to. The interference by Mr. Rahman after he was terminated as an employee goes to the exact issue of the relationship. Let me ask you a question. I haven't found a but is there a case where you have a parent company who can claim a tortious interference of a contractual relationship between a subsidiary of the parent company with a relationship who has a contractual relationship with another company? I don't think just based on those facts, Judge, but a contract is not required. I understand a contract is not required, but here, Onomata is really just the majority shareholder. No, that's not the case. Okay, explain to me where I'm wrong. Where I believe that you may be mistaken based upon the briefing is that there was evidence of Onomata's direct relationship here. Craig Smith was negotiating the extension of this very contract at the time Mr. Rahman interfered with it. Importantly, two pieces of evidence went in before the jury on this exact... So your argument is that you had a legal interest or you had some kind of... You clearly didn't have a contract because service agreement was between True Influence and the other company. Right, Judge. But you're arguing that there was a, I guess, a legal interest or you had some legal rights? Well, there was obviously an economic and a business relationship and a business interest. And let me give you the exact evidence that the jury heard from Mr. Smith. Two pieces of evidence, emails from Mr. Rahman, were entered into evidence and argued before the jury. The first one is, this is Mr. Rahman telling True Influence, the Onomata team didn't have the sophistication to contribute in any meaningful way. These customers are coming to me direct now. Second email, he says, please also note that this financial also reflect the fact that these Onomata guys haven't contributed a single line of code or bought any new customers compared to what Sabira and I did. It goes on to talk about the companies being now worth $5 million after. I understand that, but the service agreement between the two companies, between True Influence and Locobox, was a service agreement that was renewed each year. And so the agreement then was not renewed when Mr. Rahman was terminated. Right. Other evidence the jury heard were the emails between True Influence and Mr. Rahman, while Mr. Smith at Onomata was negotiating an extension of that contract. At that very time, they decide to hire Mr. Rahman. And there's an email that even says we can just. I guess my, and I speak for myself only, which is that I'm just trying to understand what OneMata's, where they fit into the puzzle of their majority shareholder, but it's not a, there's not a merger between the two companies. No, but their employees are doing all the work with True Influence. I mean, the true, the true entity here that's working with True Influence. Well, I understand because Mr. Rahman at the time, was he still, was he that, or he was still an employee of Locobox? Before his termination, he was an employee of Locobox. After his termination, all the employees doing the True Influence work and negotiating the new contract were all Onomata employees. And he is disparaging Onomata to Locobox, which is how they decided they're not going to go forward with the contract. So you're saying that a practical, a practical real connection is enough. And the other side is saying that a formal legal connection is what's required. Am I boiling that down correctly? Well, I think Judge, the answer to this is we're second guessing what the jury did. And what's, and I will agree with counsel on one thing. What's critically important is the jury instruction, which the judge gave, which I think is a correct. I was going to ask you, what was the jury instruction? Can you read it to us? I certainly will. It's, the jury instruction was the issues for you to decide on Onomata's claim against Rahman for tortious interference is whether Rahman intentionally interfered with a contract between Locobox and True Influence. And if so, whether such interference was a legal cause of damage to Onomata. To which on his, on three different Rule 50 motions, Judge Dimitriolos found based on the foregoing, it is clear that the evidence presented to the jury together with any logical influences, inferences was competent to support Onomata's claim for tortious interference. Did Mr. Rahman make any objection to those jury instructions? There was no objection to that jury instruction that I know of your honor, not that I recall. Um, if there are other questions on True Influence, I'd be happy to answer it. There's one very important thing they raise in their briefs. They say, well, there's can't show damages here. Well, the fact is the contract said 17,000 a month, but the reality was Mr. Rahman testified that they, that the parties had amended that to take $40,000 a month. So $40,000 a month, it's not that many months to get to $2 million on damages. So that's all I'll say about that. But I do want to address the larger issue about, um, the $5 million jury verdict award and I'll be, the appellants have done a good job of making it very confusing in their brief. First, they say the jury completely relied on Mr. Senior's valuation. Well, let me tell you, there was a lot of evidence as Judge Wilson has said data points in this case that would establish damages, whether or not they considered Mr. Senior's valuation at all. For example, Mr. Smith testified he bought this company based on a positive cashflow. Well, it had a very negative cashflow because of the fraud in the financial statements and expenses being understated, which Mr. Rahman admitted on the stand. On the books of Onamada, it was valued at zero. And Mr. Smith, Onamada had to put in $4 million in the first year just to keep this company afloat. So the jury could have very easily determined that the real value of this company at the time of the purchase was zero. The second area that's very confusing in their briefs is they, they make the claim, well, Mr. Senior considered X mode contingent liability in the customer server issue and unpaid taxes and coming to his valuation. That is not what he testified to. And looking at, uh, this is a docket entry 384, page 69. Uh, this is exactly what he said in his testimony. Now you were asked to, well, strike that. Why did you reflect that X mode situation as a contingent liability in your report? We thought it was relevant to disclose that, but we were very careful in the way we did disclose it as a separate line item that didn't impact our conclusion of value of the enterprise and was footnoted that line item, that it was the estimate that had been provided to us by management. He didn't even consider that as part of his two point plus million dollar valuation. And if he had considered it, the likely value of this company would have been zero or less than zero. So there was a lot of other, uh, evidence of damages here. There's no reason to conclude that they relied on or, or even considered Mr. Senior's valuation. The one other thing that they did consider was, and I think, I think it was judge Gibson. It might've been judge Grant talked about how this was argued at trial. And I had a demonstrative exhibit and I said, okay, we based our damages on what did it cost to buy this company that turns out to be worthless, valueless, well, negative value. Well, first there was 2 million in cash that was given to Mr. Rahman and Ms. Arafat. Second, they got values that shares in the company, which were agreed to at a value of $2.5 million. That's $4.5 million. They're still stockholders. They still own that stock and they still have the money. So no matter how you look at it, and this confusion about the promissory notes doesn't really make any difference because the math works. And this is, look, I wasn't in the jury room, but I'm saying they had all of these numbers. One of the things I argued to the jury was, well, if you just take the cash and the stock they got, that's over four and a half million dollars at trial, they admitted, and this was part of their request for remittance, that the other undisclosed liabilities that Onamada had to pay after closing, the Acton settlement, Amazon server theft, where they just ran up Amazon bills and didn't pay them before closing. And these liabilities, oh, and also Sabera Arafat took out almost all the cash two take $4.5 plus $670,000, it's $5.2 million. So they had a lot of data points to consider what Onamada's damages were. Had nothing to do with the promissory notes. Yes, they made a determination that Raman and Arafat should not be paid the promissory notes, but there was more than sufficient value here in actual hard damages, whether they considered seniors report or not, to award these damages. And if there's any question on the damages that the panel may have, I'd be happy to answer that. There were a number of other issues that were raised by the appellants, and I would be happy to address those to the court if there are specific questions about it. I've just got one follow-up on the earlier issue. I was looking at the first JMOL hearing, and it looks like your opponents did raise the argument that Onamada does not have standing, and it's not the real party in interest to bring a tortious interference claim. That claim is owned by local blocks. And then the district court indicates that it's a question of most favorable to the plaintiff. Do you think there's a legal question that we would decide about whether there was enough to believe that they had this legal relationship or whether the jury had the ability to conclude that there was or was not that legal relationship? With all due respect, I think it's a jury question for the jury to decide after they've heard all the evidence. And something I haven't said is that in the actual working relationship between True Influence, the work was being done with Onamada. I mean, everyone understood that that's where the employees were. That's where the money was coming from. It's where the money was going. They were negotiating the contract. So I think it's clearly a jury question for the jury to answer. And this was... Because the jury had the stock purchase agreement itself, right? Correct. And that was the basis for the breach of contract based on fraud was the breach of the representations and warranties in the stock purchase agreement. So we went through all of that. We went through all of the representations and warranties. But again, and the issue for me for the tortious interference claim is that Onamada is still just a majority shareholder. That's what they are. They're not... There's no shoes of local box. They're in essence either a parent corporation if they have these subsidiary employees. I mean, that's truly the issue I'm having with regards to... Do you have an objection if this question was certified to the Florida Supreme Court? Well, yes, because I think it's a jury question first and we should... It's a question of law as to whether or not this states a cause of action. Well, I would go back to what you said, Judge, and you're assuming... You said there's no merger and they didn't step into the shoes. I think Onamada did step into the shoes of local box in every practical way in dealing with true influence in their business relationship, in the data that they were processing. They were using all Onamada's software engineers. Brad Brown, who was the chief information... But under the law, and this is in font, you have to have the existence of a business relationship under which the plaintiff has legal rights. Well, I think they did have legal... Under what theory did you have legal rights? Well, they had legal rights because when they bought local blocks, part of what they bought was this contract and they were negotiating for an extension of this contract. They were very close to an extension when Mr. Rahman interceded and they learned that he'd been fired and Rahman goes to them and goes, hey, hire me and my team. Onamada can't do it. They don't know anything about the code. They haven't contributed anything about the code. I guess what I'm saying, Judge, on a factual basis, the jury had more than enough information to conclude that there was a business relationship between Onamada and local blocks. Okay. Thank you. All right. Thank you, Mr. Leffert. And Mr. Maverick, you've reserved some time for rebuttal. Thank you. So in the jury instruction, it talks about legal cause when we're dealing with tortious interference, legal cause. It is a question of law. This is not a factual question. The evidence is clear and counsel said that one of the issues they bought was the contract. They didn't buy the contract. This is a purchase of a corporation. You bought stock. It's not an asset purchase. That was not like you didn't acquire the contract, you acquired the corporation. And as a shareholder, the shareholder doesn't have a right to bring a tortious interference claim. Look, they control local blocks. They could have brought the claim the correct way, the orthodox way, where the local block is making the lawsuit. And they're saying there's under Florida law. They've taken an unorthodox approach here. Why didn't you raise an objection to the jury instructions? Because those jury instructions, it seemed to me, if those are correct, it seems to me that the jury pretty clearly could come to the decision that it came to. So why not raise an objection to those? Well, the facts had a play at a trial and it does use the term legal cause, not cause, not factual causation, legal cause. And what they're doing is stretching something when the admitted evidence at trial clearly then specifies that under Rule 50 motion. It's before you get to that point. It shouldn't have gotten to a charging conference. That was right there at that point where they admitted they're distinct companies. There was no merger. The contract was solely between local blocks and true influence. Those admissions by themselves are sufficient where they don't, they're not the real party interest. They don't own the contract. They don't have a right to the contract. They don't have the right to the monies under the contract. They're only a shareholder in the corporation. So they're not a real party to it. And it wouldn't get to a charging conference. And that's why we raised it. And we view this as a question of law. It's outside the boundaries of Florida law and it's being stretched. So that was, you made that argument in your motion for judgment as a matter of law. Yes, Your Honor. And the, the, your, your most, the evidence has to, we say it has to be so strongly and overwhelmingly in favor of one party that the court reasonably believes that reasonable men could not arrive at a contrary verdict. That's a pretty tough standard to overcome. Except with the admissions here that they already, the admissions are clear by the other party that they are not, they are a distinct company. They're not merged as a company. They're merely a shareholder and the contracts with another company. That would have been a case of tortious interference. As I said, if they could So the court rejected, the district judge rejected that argument. And I respect Judge Romantoulas. He's an excellent judge and I, I respectfully disagree with his decision, but he's a superb judge. And I, but I don't agree as a matter of law on that issue. And, and I, so did I answer your question, Your Honor? Yep, that answers my question. Okay. On one other issue, Your Honor, for the court, on the valuation, I think it's important to point out the original purchase price of the company was 7.5 million. And here's how it breaks down in the promissory notes. And this is, this is identified in the purchase agreement. The notes were $2,994,827. So that, without that, that, that purchase price, this is a contract case, not a tort case. So it's a purchase price of 7.5 million approximately. And the notes are about 3 million. There's 2,900,000-something, call it three. So you're dealing with a distinct set of numbers and the jury has rejected the promissory notes, which they refuse to pay. You can't have a $5 million damage claim in it when you're not being paid the 3 million in the notes, when they're rejecting that too. It becomes punitive. And that's, in this case, a reasonable trial or fact, a reasonable jury can't reach that conclusion because you're limited to the contract purchase price minus the actual value that you got. There's a difference in that as your expectation damages. And it's gone past that. What case do you have that says that? Well, Florida law and the instructions on contract damages, because it's not a, it's not a consequential damage case. It's a, it's a, it's what are the natural damages that flow from this? And so it's, it's the jury instructions as to what are contract damages. And that would be the difference between the purchase price and what you actually got. And their experts said 5 million, but you can't go past the 3 million. You haven't gotten the payment of the notes. Even their own expert assumed in his analysis that the notes were actually paid, that the consideration was there. The entire position of the, of the plaintiff at trial has been that this is not, you know, we're not seeking more than what the actual damage was. This is not a damage issue on the 3 million non-payment of that note. The jury didn't come back and say $8 million. They said it's 5 million in damages, but they refused to pay the note. It's not a reasonable, a reasonable trial fact couldn't reach that kind of conclusion. It's not within their province to reach that conclusion. And I recognize there's deference to the, to the jury. I understand that. But this has gone past that and it's outside the boundaries of what they could reasonably reach. All right. Thank you, Mr. Maverick. Mr. Wenderman, have you reserved some time? No. All right. Thank you. Thank you, counsel. Thank you.